## DOROTHY MERRILL, ADMINISTRATRIX,
*versus*
## JOSEPH SHERBURNE ET AL.

An act of the legislature awarding a new trial in an action which has been decided in a court of law, is an exercise of judicial power. It is also in its operation retrospective ; and for these two reasons is unconstitutional.

WOODBURY, J.* delivered the opinion of the court.

This case was an appeal from a decree of the court of probate in this county, approving an instrument which purported to be the last will of Nathaniel Ward.

It appeared from the copies of the proceedings, and the admissions of the parties, that on the 6th day of June, A. D. 1806, Ward died ; that in the instrument before mentioned, all his property was devised to Benjamin Merrill, the plaintiff's intestate ; that on the 23d day of the same month, Merrill obtained a decree of the court of probate, approving and allowing in common form, said instrument as the last will of Ward ; that Merrill thereupon took and retained quiet possession of said property till December 28, 1812, when the defendants, being heirs at law of Ward, petitioned the court of probate to reconsider, in solemn form, the decree before mentioned, and to disallow said instrument ; that on the 4th of February, A. D. 1813, said court did reconsider and affirm the former decree ; that the defendants claimed an appeal therefrom to the superior court, in which, the appeal having been entered, all the issues joined between the parties were, at November term, 1813, found against said Merrill ; that he then made a motion for a new trial, which, after a full hearing, was refused, and at November term, 1814, final judgment was rendered, that the decree of the court of probate be reversed, and said instrument disallowed. Merrill then petitioned the legislature for another trial ; and they, at their June session, A. D. 1817, passed an act, granting to the plaintiff, as administratrix of Merrill, at that time deceased, liberty to re-enter said cause in the superior court, and there have it re-tried like common cases of review. Pursuant to that act the plaintiff served a copy of it on the defendants,

* RICHARDSON, C. J., having been of counsel, did not sit in this cause.

which required them to appear in this court at September term, 1817, and proceed to a new trial of the cause. The names of the parties were at that term entered on the docket, and, the defendants appearing, moved the court to quash the proceedings, on the ground that the act of the legislature was unconstitutional. The cause was continued for argument upon that motion, and is now to be decided.

It involves a question of no small magnitude ; for the motion contains a charge that encroachments have been made upon constitutional rights ; and though in form the measures of a breach of the government towards a few individuals only are arraigned, yet, in substance, these measures affect the interest of all, as the rule of construction adopted to-day may become a precedent to-morrow, and be adduced to vindicate or oppose similar conduct towards every member of society. The alarm thus excited induces most people to listen to such charges with great readiness ; and it would not be unnatural for courts, in examining these charges, sometimes to fancy the existence of what is only feared.

Perhaps, also, it is inseparable from the structure of the legislative and judicial departments, that jealousies should arise between them as to the exercise of their respective powers. For they were intended, in some degree, to be mutual checks ;(1) and though, thus situated, both ought to rejoice that their own errors can be discovered and corrected ; yet such are the dispositions of mankind, that collision is often the consequence of these checks ; and encroachments are suspected where none are meditated, and when in truth the obnoxious measures were only new exercises of legitimate powers. To detect mistakes in others is likewise flattering to the vanity and ingenuity of some.

From these and similar circumstances, therefore, it has happened that questions of this nature have not always been examined with that coolness and patience which their importance deserved ; and that since the adoption of our constitutions, courts of justice, as well as legislative bodies,

(1) Millar on Ranks 287. Fed., No. 47, 78.

have furnished some complaints that their jurisdiction has been violated, when those complaints were not founded upon sound principles or respectable precedents. Conscious of the force of these considerations, we have, in the present cause, experienced considerable embarrassment: but duty has compelled us to act, and, it hardly need be repeated, that we have attempted to divest ourselves of every feeling, except an earnest desire to perform what duty dictated. It must be admitted that courts ought to decide, according "to the laws of the land," all cases which are submitted to their examination. To do this, however, we must examine those laws(1.) The constitution is one of them, and "is, in fact, and must be regarded by the judges, as a fundamental law." (2) It was created by the people, who, in our republics, are "the supreme power;"(3) and it being the expression of their will, their agents, as are all the branches of government,(4) can perform no act which, if contrary to that will, should be deemed lawful. "To deny this, would be to "affirm that the deputy is greater than his principal; that "the servant is above his master; that the representatives "of the people are superior to the people themselves; that "men acting by virtue of power may do 'not only what "their powers do not authorize, but what they forbid.'" Their oaths of office, too, prohibit, and the constitution itself, in express terms, prohibits, the legislature from making "laws repugnant or contrary to the constitution." "If, "then, there should happen to be an irreconcilable vari- "ance between the constitution and a statute, that which "has the superior obligation and validity ought, of course, to "be preferred: in other words," "the intention of the "people ought to be preferred to the intention of their "agents." "Nor does this conclusion by any means sup- "pose a superiority of the judicial to the legislative power. "It only supposes that the power of the people is superior "to both; and that where the will of the legislature, de- "clared in its statutes, stands in opposition to that of the "people, declared in the constitution, the judges ought to

*Marginal notes:*
Merrill
*vs.*
Sherburne & al.

(1) Fed., No. 78. 7 John. 494. 3 Cook 7. 6 Bac., stat. 11.
(2) Fed., No. 78.
(3) Bill of Rights, Art. 8.
(4) Bill of Rights, Art. 8.

Merrill
vs.
Sherburne & al.

"be governed by the latter rather than the former. They "ought to regulate their decision by the fundamental laws, "rather than by those which are not fundamental." Our confidence, also, in the liberality of the legislature is such, that when, through inadvertence or mistake, they have passed an unauthorized act, we believe that, should the unpleasant task of adjudging it void devolve upon us, they would think the task is performed only from a conviction that the act is in the *clearest* manner unconstitutional, and that our right and duty so to pronounce it are both unquestionable(1.) To determine whether its act, which awarded a new trial to the plaintiff, was thus unconstitutional, it is necessary to ascertain what was the nature and effect. When Ward died, all his estate descended to the defendants, unless by him devised to other persons. (*Stat.* 207.) Merrill claimed that it had been "devised" to him : the defendants questioned it : a controversy commenced : legal proceedings were instituted ; and, after two hearings on the merits, and after a new trial had been asked and refused, it was adjudged that Ward had made no valid devise of his estate. Being dissatisfied with these decisions, Merrill transferred his application for a new trial, to the legislature. They examined his testimony, and heard counsel. They then, by the present act, enabled him "to enter said cause "anew at the superior court," and directed "that said cause "have a day in said court, and shall be heard, tried and "determined in said court upon pleadings had in the former "trial ; and the said court are hereby authorized and em- "powered, upon said new trial, to affirm or reverse the "former judgment or decree, had on the appeal aforesaid, "as the said new trial may terminate for or against either "party," &c.

This does not empower the court in their discretion to grant or refuse a new trial ; but directs that "the cause shall be heard" again ; and thus amounts to an absolute reversal of the judgment in Nov., 1814, against the motion of

(1) Da. 386.
1 Cranch 175.
4 Mass. Rep. 1.
5 do. 533.   6 do.
77, 375.   10 do.
391.   11 do. 402.
12 do. 253.
4 John. 75, 80.
8 do. 388.   9 do.
464.   1 Gal. 19.

Merrill for another trial, and also to an alteration of the judg- ment on the merits, from a final and absolute judgment to a judgment which this court might " affirm or reverse," as the said new " trial might terminate for or against either party." Whether in their inquiries the legislature and the court proceeded upon the same or different evidence, doth not change the nature and effect of the act, when stripped of the forms of legislation ; because, unless it virtually reversed the judgment which was rendered against the motion of the plaintiff, and altered, as above mentioned, the judgment on the merits, they could be pleaded in bar to the present proceedings ; and we should not be justified in holding another trial, and in rendering another judgment in this case, while the first judgment remained in full force.

Such being the operation of the act, it becomes proper to examine,

First, Whether the passage of it was not an exercise of judicial powers.

Second, If it was, whether our legislature are a branch of the judiciary.

Third, If they are not, it will then remain to inquire, whether the legislature, either by special clauses in the constitution, or as a mere legislative body, possess authority to pass an act containing such provisions as the act under consideration.

1. No particular definition of judicial powers is given in the constitution ; and, considering the general nature of the instrument, none was to be expected. Critical statements of the meanings, in which all important words were employed, would have swollen into volumes ; and when those words possessed a customary signification, a definition of them would have been useless. But " powers judicial," " judiciary powers," and " judicatories," are all phrases used in the constitution : and, though not particularly defined, are still so used to designate with clearness that department of government which it was intended should interpret and administer the laws. On general principles, therefore, those

Merrill
*vs.*
Sherburne & al.

inquiries, deliberations, orders and decrees, which are peculiar to such a department, must in their nature be judicial acts. Nor can they be both judicial and legislative; because a marked difference exists between the employments of judicial and legislative tribunals. The former decide upon the the legality of claims and conduct ; the latter make rules, upon which, in connexion with the constitution, those decisions should be founded. It is the province of judges to determine what is the law upon existing cases(1.) In fine, the law is *applied* by the one, and *made* by the other. To do the first, therefore ; to compare the claims of parties with the laws of the land before established, is in its nature a judicial act. But to do the last ; to pass new rules for the regulation of new controversies, is in its nature a legislative act ; and if these rules interfere with the past or the present, and do not look wholly to the future, they violate the definition of a law, " as a rule of civil conduct ;"(2) because no rule of conduct can with consistency operate upon what occurred before the rule itself was promulgated.

(1) 6 Bac., stat. 11. 2 Cran. 272. 7 John. 498.

(2) 1 Bl. C. 44.

It is the province of judicial power, also, to decide private disputes " between or concerning persons ;"(3) but of legislative power, to regulate public concerns, and to " make laws" for the benefit and welfare of the state(4.) Nor does the passage of private statutes conflict with these principles ; because such statutes, when lawful, are enacted on petition, or by the consent of all concerned ; or else they forbear to interfere with past transactions and vested rights (5.) As the legislature, then, in the act under consideration, adjudicated on a case which had already happened, and had been litigated between individuals, their proceedings must, on general principles, be deemed an exercise of judicial powers. But regarded in a more particular sense, the character of their proceedings cannot be different.

(3) Con., p. 9.

(4) Con., p. 7.

(5) 2 John. 263. 8 Co. 138, a. 1 Inst. 176. 2 Cran. 341, 345. Bl. C. 344, 345.

A legal process had been instituted in a subordinate court ; had been heard ; and then, by appeal, carried to a higher

tribunal. It had been re-heard in that tribunal ; and, after a motion for a new trial, was overruled, a final judgment had been rendered, which by existing statutes closed the controversy forever. The legislature then undertake to revise these proceedings ; they convene the parties ; canvass the evidence ; and afterwards reverse, in substance, the interlocutory judgment, and materially alter the effect of the final judgment of this court. If these doings of the legislature are considered a mere continuation of the former doings of the courts, then, as those former ones were judicial, so are these. But if they are considered as disconnected with the former doings, they are still judicial, on account of their nature and effect. The grant of a new trial belongs to the courts of law, from immemorial usage. The power to grant a new trial is incidental to their other powers. It is a judgment in relation to a private controversy ; affects what has already happened ; and results from a comparison of evidence and claims with the existing laws. It will not be denied that the consideration and decision, by the superior court, of the motion for this same new trial, was an exercise of judicial power. If so, a consideration and decision upon the same subject by the legislature must be an exercise of power of the same description ; for what is in its nature judicial to-day, must be judicial to-morrow and forever. The circumstance, also, that the legislature themselves did not proceed to make a final judgment on the merits of the controversy between these parties, cannot alter the character of the act granting a new trial. To award such a trial was one judicial act ; and because they did not proceed to perform another, by holding that trial before themselves, the first act did not become any more or less a judicial one. We apprehend, therefore, that the character of the act under consideration must be deemed judicial. This position will probably be less doubted, than the position that our constitution has not confided to the legislature the power to pass such an act. But that power, if confided, must

Merrill
*vs.*
Sherburne & al.

be exercised by the legislature as a branch of the judiciary, or under some special provision, or as a mere legislative body.

2. Our next inquiry, then, is, whether they, as a branch of the judiciary, are enabled to exercise it. No article in the constitution can be designated, which in specific terms makes the legislature a branch of the judiciary. Consequently, if they are, it must depend upon inference, and that inference, it is admitted, can be drawn from nothing but the grant of powers to the general court, and from the 31st and 37th articles in the bill of rights. By that grant they are invested " with full authority to make all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions and instructions, either with penalties or without, so as the same be not repugnant or contrary to this constitution." But nothing is here said of decrees or judgments, or of judicial power. The phraseology is altogether peculiar to legislative subjects. Though styled the general court of New-Hampshire,"(1) they are considered in the first section to be merely "the supreme legislative power." The constitution then proceeds to state, not that this general court shall be a branch of the judiciary, but that "they shall forever have full power and authority to erect and constitute judicatories;" not that they themselves shall hear and try private controversies, but that the " courts of record" so constituted " shall be holden in the name of the state, for " the hearing, trying and determining all manner of crimes, " offences, pleas, processes, plaints, actions, causes and things " whatsoever, arising or happening within this state, or " between or concerning persons inhabiting or residing or " brought within the same."

(1) Const. 9.
3 Cok. Pref. 7.

As to the 31st article of the bill of rights, it merely provides that " the legislature shall assemble for the redress of " public grievances, and for making such laws as the public " good may require." Yet " the grievance" attempted to be redressed by the act under consideration, was not a " *public*"

one; and, if it were, the obvious meaning of the article is, that such grievances should be redressed by "laws," and not by proceedings which are in their nature judgments. The constitution afterwards confers upon the legislature only legislative power for the purpose of effecting that "redress."

The 37th article is more ambiguous. It declares, that in the government of this state "the three essential powers "thereof, to wit., the legislative, executive and judicial, "ought to be kept as separate from, and independent of, each "other as the nature of a free government will admit, or as "is consistent with that chain of connexion which binds "the whole fabric of the constitution in one indissoluble "bond of union and amity."

It has been contended, and we with readiness admit, that from the close of this article the inference is clear, that our constitution did not intend to make a total separation of the three powers of the government. The executive was to be united with the legislature, in the passage of laws; and the former was to depend upon the latter for his salary. A part of the judiciary, too, was united with a part of the legislature in the trial of some impeachments; and all of the judiciary were made dependent on the executive for appointments, and on the legislature and executive for the erection of courts, the apportionment of jurisdiction, for compensation, and for removal by address.

But these connexions and dependencies are not left to implication; they are all created by subsequent express provisions: and the above article was probably clothed in such cautious language that it might not conflict with those provisions.(1) It means no more than a similar article in the Illinois constitution, which, after dividing the powers of government, proceeds to say,(2) " that no person, or collec- "tion of persons, being one of those departments, shall ex- "ercise any power properly belonging to either of the others, "except as hereinafter *expressly* directed or permitted." For in our constitution, if any one power, not afterwards

*Margin notes:*

Merrill
*vs.*
Sherburne & al.

(1) Fed., No. 47, Mr. Madison.

(2) 15 Niles' Reg. 93.

Merrill
*vs.*
Sherburne & al.

expressly permitted or properly belonging to one department, could be exercised by it through implication, these consequences will follow ; either that no powers need have been expressly permitted or apportioned, as the whole could through implication be exercised by either branch : or that, though some are expressly apportioned, others may be implied and expressed contrary to the *spirit* of what are so apportioned.

As the 37th article, then, declares the general propriety of a separation between the different departments of government, and as it contains no qualifications of that principle, which are inconsistent with excluding the legislature from judicial powers, properly belonging to another department, no inference from this article can be deduced that the legislature were intended to be a branch of the judiciary. In fine, that they were not so intended by this or any other part of the constitution, is manifest from many more circumstances, some of which it may be proper to enumerate.

At the formation of our present constitution, whatever might have been the prior connexion between the legislative and judicial departments, a great solicitude existed to keep them, thenceforward, on the subject of private controversies, perfectly separate and independent. [*Bl. C., Apx. A : Letter of Judges Sup. Court of United States, April,* 1782.]

It was well known and considered, that " in the distinct " and separate existence of the judicial power consists one " main preservative of the public liberty(1) ; that, indeed, " ' there is no liberty, if the power of judging be not separated from the legislative and executive powers.' "(2) In other words, that " the union of these two powers is " tyranny ;"(3) or, as Mr. Madison observes, " may justly be " pronounced the very definition of tyranny ;"(4) or, in the

(1) Bl. C. 269.

(2) Montesquieu, B. 11. Co. 6.

(3) 7 John. 508.
(4) Fed., No. 47.

language of Mr. Jefferson, "is precisely the definition of despotic government"(1).

Not a single constitution, therefore, exists in the whole Union, which does not adopt this principle of separation as a part of its basis (2). We are aware that in Connecticut, till lately, and still in New-York, a part of their legislature exercise some judicial authority(3). This is probably a relic of the rude and monarchical governments of the eastern world; in some of which no division of powers existed in theory, and very little in practice. Even in England the executive and judicial departments were once united(4); and when our ancestors emigrated hither, they, from imitation, smallness of numbers and attachment to popular forms, vested often in one department not only distinct, but sometimes, universal powers(5).

The practice of their assemblies to perform judicial acts(6) has contributed to produce an impression that our legislatures can also perform them. But it should be remembered, that those assemblies were restrained by no constitutions, and that the evils of this practice,(7) united with the increase of political science, have produced the very changes and prohibitions before mentioned. The exceptions in Connecticut and New-York do not affect the argument; because those exceptions are not implied, but detailed in specific terms in their charters: and this power, also, as in the House of Lords in England, is in those states to be exercised in the form of judgments and not of laws; and by *one* branch, and not by all, of the legislature(8). "The entire legislature can perform no judiciary act"(9). It is questionable whether at this day such an act by all the branches of the British parliament, though in theory omnipotent, could be enforced(10). "There is a statute, made in the 4th year of king Henry IV., ch. 22, whereby it is enacted, that judgment given by the king's courts shall not be examined in the chancery, parliament, nor elsewhere." [*Doctor and Student, Dialogue* 1, *ch.* 8.]

Merrill
*vs.*
Sherburne & al.

(1) Notes on Vir. 195.
(2) Fed. No. 81. 1 Bl. App'x 126, Tuck. Ed. 3 Niles' Reg. 2 4 do. 400.
(3) 4 Niles' Reg. 443.

(4) 1 Bl. 267. 2 Hutch. Hist. 107.

(5) 2 Wils. Wks. 50. 1 Minot's His. 27. 1 Hutch. His. 30. 2 do. 250, 414.
(6) 3 Dal. 386, Calden & wife vs. Bull & al.

(7) Fed. No. 44.

(8) 4 Niles' Reg. 444.
(9) Fed. No. 47.

(10) 1 Bl. C. 44. 2 do. 344.

Merrill
*vs.*
Sherburne & al.

(1) Bill of
Rights. Art. 1, 7,
8, 38.

(2) Const. 7, 9,
22, 20.

(3) Ham. Wks.
255.

Be this, however, as it may in that country; one great object of constitutions here, (*Fed.*, *No.* 81,) was to limit the powers of all the departments of government(1) : and our constitution contains many express provisions in relation to them, which are wholly irreconcilable with the exercise of judicial powers by the legislature, as a branch of the judiciary. That clause which confers upon the " general court" the authority "to make laws," provides, at the same time, that they must not be " repugnant or contrary to the constitution." One prominent reason for creating the judicial, distinct from the legislative department, was, that the former might determine when laws were thus "repugnant," and so operate as a check upon the latter, and as a safeguard to the people against its mistakes or encroachments. But the judiciary would in every respect cease to be a check on the legislature, if the legislature could at pleasure revise or alter any of the judgments of the judiciary. The legislature, too, would thus become the court of last resort, " the superior court," or " supreme judicial" tribunal of the state ; and those expressions so often applied to this court in the constitution(2) would become gross misnomers. If our legislators, too, possess such high judicial powers, much consistency cannot exist in the provision, that "upon important questions of law and upon solemn occasions" they may be advised by the justices of this court; which, on the above principle, is inferior and subordinate. Nor is this all. " Every reason which recommends the tenure of good behavior " for judicial officers, militates against placing the judiciary " power in the last resort in a body composed of men chosen " for a limited period ;(3) men, too, not selected for their " knowledge of the laws, nor with a view to those other " qualifications which fit men to be judges." Nor are our legislators commissioned and sworn in any manner as judicial officers are required to be. Nor can they, like judges, for malconduct, be removed by address or impeachment. Because the House themselves are the tribunal to try impeachments : and both, united, are the bodies authorized to

present addresses for removals (1).   Nor can it easily be
conceived that the judiciary are independant of the legis-
lature to any extent, however small, if the legislature itself
compose a part of that judiciary.

Merrill
*vs.*
Sherburne & al.

(1) Const. 13.

Certain reasons induce us to rest this opinion upon gen-
eral principles ; but under this point it may not be unimpor-
tant to notice one consideration of a particular nature.   The
constitution itself seems to declare what tribunals shall ex-
ercise jurisdiction over the subject matter of the dispute
between the present plaintiff and defendants.   For it says, in
express language, that, till other provisions are made, the
probate of wills "shall be exercised by the judges of pro-
bate," and "all appeals from the respective judges of pro-
bate shall be heard and tried by the superior court "(2).
No provisions have since been made which transferred any
part of the above power to the legislature.

(2) Const. 20.

In deciding an abstract question like this, it cannot, we
apprehend, be material, whether a view is provided in ab-
peals from courts of probate ; or whether, after judgment in
such appeals, a new trial could be awarded by this court on
petition by the party aggrieved.   Because, if all our statutes
on reviews and new trials were repealed to-morrow, the leg-
islature would possess no more authority to exercise judicial
powers than they now possess, as their authority was con-
fined and limited by the people at the formation of the con-
stitution ; and must continue as it was then, until the constitu-
tion itself is altered.   A different construction would enable
the legislature, if the court of common pleas was abolished,
to issue writs and try causes till other courts for that purpose
were organized ; and if no sheriffs happened to be in office,
to proceed also to serve the writs issued by themselves.

3. As our legislature, then, are not a branch of the judi-
ciary, it only remains to inquire, whether, without being
made a branch of the judiciary, they are, either by special
clauses in the constitution, or as a mere legislative body,
authorized to pass the act under consideration.

Merrill
*vs.*
Sherburne & al.

The people being supreme, might, without intending to make the legislature a branch of the judiciary, have invested them, by some special clause, with that judicial power which was exercised in this act. But no such clause has been found in the constitution, and without such a clause it would be most unwarrantable to presume that the people intended to confer this judicial power on the legislature, when all the reasons before mentioned, and the spirit of the people's language in the whole instrument, forbid such a presumption. If our general court, then, were in any capacity authorized to pass this act, it must have been in that of mere legislators. The legislative power is surely one of the most honorable and useful in all governments. We should be among the last persons inclined to impair its rights. As it emanates more immediately from the people, it should also be ample, in order that the grievances of the people may be redressed ; and we entertain no doubt that in this state, all its acts of a legislative character, not prohibited by our constitution, should be supported and construed favorably(1).

(1) 7 John. 492, Dash vs. Vanclack.

But those acts must, in *substance*, be of a legislative character. Their form is immaterial. They must be *laws*, must be confined to subsequent occurrences. For the very nature and effect of a new law is a rule for future cases(2). They must, too, in general, be rules prescribed for civil conduct to the whole community, and not a "transient, sudden order from a superior to, or concerning a particular person(3).

(2) 7 John. 503. 2 Inst. 95.

(3) 1 Bl. C. 44.

For every subject of this state is entitled to a certain remedy, by having recourse to the laws(4) ; but an act which operates on the rights or property of only a few individuals, without their consent, is a violation of the equality of privileges guaranteed to every subject. It is, also, an interference with existing interests, and prescribes a new rule for the regulation of them, after they have become vested. This is forbidden by first principles. "*Vetant leges sacræ, vetant duodecem tabulæ legis privatis hominibus irrogare, id enim est privilegium*"(5). Acts of the legislature, too,

(4) Con. 14.

(5) Cicero de Leg. 3, 19.

which look back upon interests already settled, or events which have already happened, are *retrospective;* and our constitution has, in direct terms, prohibited them, because "highly injurious, oppressive and unjust"(1). But perhaps their invalidity results no more from this express prohibition, than from the circumstance that, in their nature and effect, they are not within the legitimate exercise of legislative power. For, though under the name of *ex post facto* laws, when "made for the punishment of offences,"(2) they have long been severely reprobated, because more common in times of commotion, and because they endanger the character and person, as well as the property : yet laws for the decision of civil causes, made after the facts on which they operate, *ex jure post facto*, are alike "retrospective," and rest on reasons alike fallacious. 7 *John.* 495.—1 *Bay.* 107.—*Bac. Stat.* 6.—3 *Ham. Wks.* 254.—7 *Mass. Rep.* 385. We wish it to be distinctly understood, however, that acts of the legislature are not within the above prohibitions, unless they operate on the interests of individuals, or of *private* corporations. *Trus. Dart. Col.* vs. *Woodward.* Nor are they within them, when, in an implied or express manner, the parties affected have consented to their passage ; as all public officers impliedly consent to alterations of the institutions in which they officiate, provided the public deem it expedient to introduce a change. So, all citizens consent to the passage of acts which the constitution in express terms has enabled the legislature to make, though those acts might otherwise be unjustifiable ; because all either aided to form, or, by living under, are presumed to adopt, the constitution(3). Thus the constitution has ratified "acts respecting the persons or estates of absentees,"(4) and has empowered "the representative body of the people to take a man's property for public uses"(5). Nor can acts of the legislature be opposed to those fundamental axioms of legislation before particularized, unless they impair rights which are *vested;* because most civil rights are derived from public

Merrill
*vs.*
Sherburne & al.

(1) Bill of
Rights, 23d Art.

(2) Dall. 386.
9 Mass. Rep. 363.
1 Bl. C. 46.

(3) 6 Bac. Stat.
4 Inst. 1.

(4) Const. 22.

(5) Const. 3.

Merrill
vs.
Sherburne & al.

laws; and if, before the rights become vested in particular individuals, the convenience of the state produces amendments or repeals of those laws, those individuals have no cause of complaint. The power that authorizes or proposes to give, may always revoke before an interest is perfected in the donee. Thus the right to prosecute actions in a particular time or manner, may perhaps be modified or taken away at any period before actions are commenced. 10 *Mass. Rep. p.* 439. So, also, may the right of *femmes covert* to dower at any period before the death of their husbands : and so the right of the next akin to a relation's estate, at any period before the relation's death. But it is questionable whether even these rights, though inchoate, and in mere expectancy, can be taken from one portion of the community and be left

(1) 12 Mass. Rep. 258.

unmolested with another portion.(1) Be that as it may, however, it is clearly unwarrantable thus to take from any citizen a vested right; a right "to do certain actions or possess certain things," which he has already begun to exercise, or to the exercise of which no obstacle exists in the

(2) 3 Dall. 294.

present laws of the land.(2) But previous to the passage of the act granting a new trial to this plaintiff, the defendants had become authorized by the laws of the land to possess all the estate of which *Ward* died seized. Every obstacle to the exercise of their rights had been removed or annulled: and whether those rights became vested by *Ward's* death, or by the final judgment in November, 1814, is immaterial; because both these events had happened before the passage

(3) 7 John. 494. Burr. 2460.

of this act.(3) The defendants, being thus situated, the legislature interfered; not to enact what is in its nature and effect a law, but to pass a decree; not to prescribe a rule for future cases, but to regulate a case which had already occurred: not to make a private statute by the consent of all concerned, but at the request of one party to reverse and alter existing judgments; not to promulgate an ordinance for a whole class of rights in the community, but

to make the action of a particular individual an exception to all standing laws on the subject in controversy.(1)

The expense and inconvenience of another trial were also imposed upon the defendants, and all their claims to the property in dispute which had become indefeasible by the laws then in being, were launched again upon the sea of litigation, to be lost or saved as accident and opinion might afterward happen to injure or befriend them.

The misfortune of having vested rights thus disturbed is not small, when we consider that on this principle no judgment whatever in a court of law is final. "If," says Germaine, J., "judgment given in the king's courts should be examined in the chancery, before the king's counsel, or any other place, the plaintiffs or demandants should seldom come to the effect of their suit, and the law should never have end."(2) The misfortune, too, is not small, when we recollect with Mr. Madison(3) that usually "one legislative in-"terference is but the link of a long chain of repetitions, till "the properties of parties are ruined in the contest." 14 *John.* 73. " The sober people of America," says he, " have seen "with regret and with indignation, that sudden changes and "legislative interference in cases affecting personal rights "become jobs in the hands of enterprizing and influential "speculators, and snares to the more industrious and less in-"formed part of the community." "It is not," says Spen-"cer J.,(4) "necessary to enquire whether a legislature can, "by the plentitude of its power, annul an existing judgment. "This power I should undoubtedly deny." " A legisla-"ture,(5) without exceeding its province, cannot reverse a "determination once made in a particular case." Neither the theory of the British nor the state constitutions authorizes the revisal of a judicial sentence by a legislative act."(6) But it has sometimes been argued, that in cases of extreme hardship legislatures are always authorized to interfere. The defendants deny this hardship: and though the record shews that before the application to the legislature two trials had been enjoyed, which is a greater number than the com-

*Margin notes:*

Merrill
vs.
Sherburne & al.

(1) 11 Mass. Rep. 396.

(2) Doct. & Stu. Dial. 1, ch. 8.
(3) Fed., No. 44.

(4) 7 John. 490.

(5) 3 Ham. Wks. 254. Jeff., No. 195.

(6) Fed., No. 81.

Merrill
*vs.*
Sherburne & al.

mon law generally allows, and that a motion for another one had also been fully heard and considered; yet all the hardship may be presumed which the plaintiff alleges, and still that could not confer upon one department of government a power which the constitution had withheld. In a case of great state necessity, the legislature might be warranted in adopting strong measures. But, even in that case, it would deserve consideration whether here they could advance beyond their delegated power. In this country it is not the legislature who are supreme, but the people; and "there is no "position which depends on clearer principles than that every "act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void."(1) The hardship in this case, however, is at the most only a pecuniary one of a mere individual, and like many other sufferings under the best system and the best administration of laws, may be remediless. Could perfect justice be always obtained, our institutions would cease to be human. Those evils, therefore, that have already been lost, and which the existing laws cannot reach, are irretrievable. In such cases it must be as unwarrantable for the legislature, as for the executive or judicial power, to interfere in such a manner as to impair interests already vested in particular members of society.

(1) 3 Ham. Wks. 230. 1 Bl. 315.

The long usage of our legislatures to grant new trials has also been deemed an argument in favor of the act under consideration. But that usage commenced under colonial institutions, where legislative powers were neither understood nor limited, as under our present constitution. Since the adoption of that, the usage has been resisted by sound civilians, and often declared void by courts of law. Though no opinions have been published, and though the decisions have been contradictory, yet the following ones appear by the records to have adjudged such acts void. *Gilman* vs. *M'Clary, Rock., Sept.,* 1791.—*Chickering* vs. *Clark, Hills.— Butterfield* vs. *Morgan, Cheshire, May,* 1797.—*Jenness & al.*

*Exrs.* vs. *Seavey, Rock., Feb.,* 1799. Nor could it be pretended, on any sound principles, that the usage to pass them, if uninterrupted for the last twenty-seven years, would amount to a justification, provided both the letter and spirit of the written charter of our liberties forbid them. That charter is the supreme law of the land to us all; and we know that the sacred regard to the rights of the people, which our legislative department have ever evinced, will induce them, as readily as ourselves, to conform to the provisions of that supreme law, whenever it is not misapprehended.

But in the passage of the act granting a new trial to the plaintiff, we are constrained to think that the constitution was misapprehended. The nature and effect of the act was judicial. It was also retrospective. The legislature cannot pass such an act; and our judgment, therefore, is, that the proceedings in this cause be quashed, and the *parties go without day.*

*Mason,* for the plaintiff.

*J. Smith,* for the defendants.

Merrill.
*vs.*
Sherburne & al.