Original
SMA-2000-003

PETITION OF THE JUDICIAL CONDUCT COMMITTEE

May 15, 2000

*Nelson, Kinder, Mosseau & Saturley, PC*, of Manchester (*William C. Saturley* on the brief and orally), for the committee on judicial conduct.

*Boynton, Waldron, Doleac, Woodman & Scott, PA*, of Portsmouth (*Charles B. Doleac* on the brief and orally), for Howard J. Zibel.

*Hill & Barlow, PC*, of Boston, Massachusetts (*Joseph D. Steinfield* on the brief and orally, and *Peter E. Ball* on the brief), for the House Judiciary Committee.

*Betsy B. Miller*, of Concord, for the New Hampshire House of Representatives.

PER CURIAM. The New Hampshire House of Representatives has authorized the House Judiciary Committee ("HJC") to conduct an impeachment investigation into matters said to involve the conduct of Chief Justice David A. Brock and/or other justices of the New Hampshire Supreme Court, and to adopt rules governing its investigation. H.R. Res. 50 (Apr. 9, 2000). The New Hampshire Supreme Court Committee on Judicial Conduct ("JCC") is conduct-

ing a concurrent investigation. Operating under rules it adopted on April 25, 2000, the HJC subpoenaed Howard J. Zibel, executive secretary of the JCC, Donna Craig, assistant executive secretary of the JCC, and David Peck, acting executive secretary of the JCC. Each subpoena required the production of documents and the taking of a deposition. The JCC filed a motion invoking this court's original jurisdiction, seeking an order requiring the HJC to allow the JCC special counsel to attend any HJC deposition of any JCC member, or employee, in order to protect the confidentiality of ongoing JCC investigations. The JCC's motion is denied.

The JCC's motion raises issues of jurisdiction and justiciability which arise within the principle of separation of powers. We address each of these issues in turn.

## I. SEPARATION OF POWERS

■ According to Part I, Article 37 of the New Hampshire Constitution:

> In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity.

The purpose of the "[s]eparation of the three co-equal branches of government is . . . to protect against a seizure of control by one branch that would threaten the ability of our citizens to remain a free and sovereign people." *Petition of Mone*, 143 N.H. 128, 134, 719 A.2d 626, 631 (1998) (citing *State v. LaFrance*, 124 N.H. 171, 176, 471 A.2d 340, 342 (1983)). The separation of powers clause prohibits each branch of government from "encroaching on the powers and functions of another branch," *Petition of Mone*, 143 N.H. at 134, 719 A.2d at 631 (citing *Opinion of the Justices*, 116 N.H. 406, 413, 360 A.2d 116, 122 (1976)), and is "violated when one branch usurps an essential power of another," *Petition of Mone*, 143 N.H. at 134, 719 A.2d at 631 (citing *Opinion of the Justices*, 121 N.H. 552, 556, 431 A.2d 783, 786 (1981); *Opinion of the Justices*, 110 N.H. 359, 363, 266 A.2d 823, 826 (1970)). The legislative and judicial powers presently at issue are the power of the House of Representatives as "the grand inquest of the state," under Part II, Article 17 of the New Hampshire Constitution and the power of the supreme court to make, promulgate, and enforce court rules that have the force and

effect of law under Part II, Article 73-a of the New Hampshire Constitution and RSA 490:4 (1997).

The HJC argues that the separation of powers doctrine enunciated by the New Hampshire Constitution bars this court from asserting jurisdiction over the JCC's request, or, if jurisdiction is proper, that this particular case is nonjusticiable. The JCC submits both that jurisdiction is proper and that this case is justiciable. We conclude that this court has jurisdiction to hear the JCC's motion, but on the facts of this case, the question presented is nonjusticiable.

## II. JURISDICTION

The HJC first argues that the judicial branch lacks jurisdiction over any matter related to a legislative impeachment investigation. We disagree.

> The investigative power of the Legislature, however penetrating and persuasive its scope, is not an absolute right but, like any right, is "limited by the neighborhood of principles of policy which are other than those on which [that] right is founded, and which become strong enough to hold their own when a certain point is reached." *United States v. Rumely*, 345 U.S. 41, 44; *Hudson Water Co. v. McCarter*, 209 U.S. 349, 355. The contending principles involved here are those underlying the power of the Legislature to investigate on the one hand and those upon which are based certain individual rights guaranteed to our citizens by the State and National Constitutions.

*Nelson v. Wyman*, 99 N.H. 33, 41, 105 A.2d 756, 764 (1954). The Court has reviewed these principles in a more recent case, in which it was said that:

> The defendants argue that this matter should not be before the court because it is beyond the scope of our jurisdiction. *See* RSA 490:4 (Supp. 1979). On the other hand, our fundamental charter states that the "judicial power of the state shall be vested in the supreme court. . . ." N.H. Const. pt. II, art. 72-a; *see also id.* pt. II, art. 74. This controversy arises under our Constitution. As we observed in an earlier dispute between a speaker of the house and a Governor:
>
>> "[The] solution involves an interpretation of our State constitution . . . relative to the executive and legislative

branches of our government. This is a traditional function conferred on the judiciary for which it is responsible. It is not within the competence of the other two branches and consequently does not fall within the bar against confiding political questions to the courts. N.H. Const. pt. I, art. 37, pt. II, art. 72-a; *Cloutier v. State Milk Control Bd.*, 92 N.H. 199, 201-02, 28 A.2d 554, 556 (1942); *see Powell v. McCormack*, 395 U.S. 486 (1969)."

*Monier v. Gallen*, 122 N.H. 474, 475-76, 446 A.2d 454, 455 (1982) (quoting *O'Neil v. Thomson*, 114 N.H. 155, 159, 316 A.2d 168, 170 (1974)).

■■ According to RSA 490:4,

[t]he supreme court . . . may issue writs of certiorari, prohibition, habeas corpus, and all other writs and processes to other courts, to corporations and to individuals, and shall do and perform all the duties reasonably requisite and necessary to be done by a court of final jurisdiction of questions of law and general superintendence of inferior courts.

The court system is available for adjudication of issues of constitutional or other fundamental rights. For example, as was acknowledged by the HJC, the judicial branch would have jurisdiction to hear issues concerning matters of constitutional privilege. In such circumstances, Part I, Article 17 of the New Hampshire Constitution does not deprive persons whose rights are violated from seeking judicial redress simply because the violation occurs in the course of an impeachment investigation.

## III. JUSTICIABILITY

■ While the judicial branch is not divested of jurisdiction over matters that may arise during a legislative impeachment investigation, the range of the matters subject to judicial review is limited by the concept of justiciability. "A controversy is nonjusticiable — *i.e.*, involves a political question — where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it . . . .'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (holding that question concerning Senate impeachment procedure was nonjusticiable) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Here, the impeachment of judges is demonstrably committed to the legislative branch by Part II, Article

17 of the New Hampshire Constitution. Acting under this constitutional authority, the House of Representatives delegated to the HJC the authority to conduct an impeachment investigation and to draft the rules under which its investigation would be conducted. The relief requested by the JCC calls for this court to overrule Rule 5 of the HJC's rules for conducting its impeachment investigation. Because the authority to make, implement, and interpret such rules is delegated by the constitution to the legislative branch, these rules are, under most circumstances, nonjusticiable. Whether witnesses before the HJC should or should not be allowed to be deposed in the presence of counsel other than their personal counsel is a political question that is not for this court.

The JCC has not presented the sort of "unusual circumstances that might justify a more searching review of impeachment proceedings." *Nixon*, 506 U.S. at 253 (Souter, J., concurring). If the HJC

> were to act in a manner seriously threatening the integrity of its results, [impeaching], say, upon a coin toss, or upon a summary determination that [a supreme court justice] was simply "'a bad guy,'" judicial interference might be appropriate. In such circumstances, the [HJC]'s action might be so far beyond the scope of its constitutional authority, and the consequent impact on the [state] so great, as to merit a judicial response despite the prudential concerns that would ordinarily counsel silence.

*Id.* (citation omitted). The issues presently before the court do not approach the types of unusual circumstances that are described above.

Not only has the JCC failed to demonstrate the sort of unusual circumstances cited in *Nixon*, it has also failed to demonstrate that either the HJC's rules or its implementation of those rules directly threatens any legal right cognizable by this court. Supreme Court Rule 40(3-a) imposes an obligation of confidentiality on persons who serve on and work for the JCC. Adherence to this obligation is enforced by the availability of contempt sanctions against those who violate Rule 40. Those contempt sanctions already protect the confidentiality of the information the JCC seeks to protect. An order requiring the HJC to allow the JCC special counsel to attend depositions would not add necessary additional protection. In addition, the HJC has represented that it intends to respect Rule 40 obligations. Thus, the rules and the actions of the HJC do not threaten the rights of those JCC members or employees who might appear before it. Any concern the JCC might have that deposition

testimony given to the HJC could result in liability to the targets of ongoing investigations is far too remote to justify judicial interference in the workings of the HJC as its carries out its constitutional duty.

## IV. CONCLUSION

The constitutional authority of the House of Representatives to conduct impeachment proceedings without interference from the judicial branch is extensive, but not so extensive as to preclude this court's jurisdiction to hear matters arising from legislative impeachment proceedings. "It is the role of this court in our co-equal, tripartite form of government to interpret the Constitution and to resolve disputes arising under it." *Petition of Mone*, 143 N.H. at 133, 719 A.2d at 631 (quoting *Monier*, 122 N.H. at 476, 446 A.2d at 455; citing *Merrill v. Sherburne*, 1 N.H. 199, 201-02 (1818)). However, upon briefing and argument, it is apparent that the specific issue raised by the JCC is nonjusticiable. Accordingly, the JCC's request for its special counsel to attend HJC depositions of JCC members and employees is denied.

BROCK, C.J., and HORTON, BRODERICK, NADEAU, and DALIANIS, JJ., did not sit; MANIAS, MANGONES, O'NEILL, COFFEY, and SMUKLER, JJ., sat by special assignment under RSA 490:3.